UNITED STATES *v.* ARNHOLD & CO., INC., ET AL. (No. 4225)[1]

---

[1] C. A. D. 74.

United States Court of Customs and Patent Appeals, October 30, 1939

*Webster J. Oliver*, Assistant Attorney General (*Charles D. Lawrence*, Special Assistant to the Attorney General, and *James F. Donnelly*, junior attorney of counsel), for the United States.

Barnes, Richardson & Colburn (*Albert MacC. Barnes, Samuel M. Richardson,* and *Hadley S. King* of counsel) for appellee.

[Oral argument October 4, 1939, by Mr. Lawrence and Mr. Albert MacC. Barnes]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, and LENROOT, Associate Judges [2]

LENROOT, Judge, delivered the opinion of the court:

The merchandise involved in this appeal consists of Chinese dogskins, imported from China. A large number of importations by different importers were made. The dogskins were classified by the collector at the port of New York as dressed fur skins and assessed with duty at 25 per centum ad valorem under the provisions of paragraph 1519 (a) of the Tariff Act of 1930.

Protests were filed claiming that the merchandise was dutiable at 20 per centum ad valorem under paragraph 1558, or alternatively free of duty under paragraph 1681.

[2] JACKSON, Judge, took no part in the consideration or decision of this case.

Before the Customs Court (First Division) the protests were con-solidated for the purposes of trial.

The trial court, Judge McClelland dissenting, held that the mer-chandise was free of duty as fur skins undressed, and sustained the protests. Judge McClelland was also of the opinion that the protests should be sustained, but under the claim of the protests that the merchandise was dutiable at 20 per centum ad valorem under the provisions of paragraph 1558 for "articles manufactured, in whole or in part, not specially provided for."

The paragraphs involved, insofar as they are pertinent to the issues decided by us, read as follows:

PAR. 1519. (a) Dressed furs and dressed fur skins (except silver or black fox), and plates, mats, linings, strips, and crosses of dressed dog, goat, or kid skins, 25 per centum ad valorem; * * *.

PAR. 1681. [Free List] Furs and fur skins, not specially provided for, undressed.

The question of the proper classification of Chinese dogskins similar to those here involved has been before this court upon three occasions, twice under the Tariff Act of 1922 and a third time under the Tariff Act of 1930. *United States* v. *M. Bernstein & Sons*, 19 C. C. P. A. (Customs) 59, T. D. 44895; *United States* v. *Arnhold & Co., Inc.*, 22 C. C. P. A. (Customs) 23, T. D. 47036; *United States* v. *Rotberg & Krieger*, 24 C. C. P. A. (Customs) 441, T. D. 48902.

In the *Bernstein & Sons* case, *supra*, it was held that dogskins must be regarded, in a tariff sense, as "furs" and, if dressed, as "furs dressed on the skin." That question is not involved in the case at bar.

In the case of *United States* v. *Arnhold & Co., Inc.*, *supra*, it was held by us on the record there presented that the dogskins there involved, in the condition imported, were neither furs "dressed" nor "furs * * * undressed," but were furs partially dressed and were dutiable by similitude to "plates and mats of dog * * * skins" under paragraph 1420 of the Tariff Act of 1922.

In the case of *United States* v. *Rotberg & Krieger*, *supra*, hereinafter referred to as the "*Rotberg* case," it was held upon the record there before us that the dogskins there involved were undressed and free of duty under paragraph 1681 of the Tariff Act of 1930.

Upon the trial of the case at bar it was established that the dogskins here involved are the same in all material respects as those involved in the *Rotberg* case. It is conceded that the process actually used in the treatment of the dogskins involved in the *Rotberg* case was the same as the process applied to the treatment of the dogskins here involved. Appellee herein moved to incorporate in the consolidated record in the instant case the record in the case last above mentioned, which was done without objection. Thereupon appellee rested its case.

The trial before the Customs Court in the instant case was begun on June 8, 1937. Upon motion of the Government the case was continued from time to time until January 24, 1938, when the trial proceeded.

After appellee rested its case the Government introduced the testimony of 14 witnesses, and appellee introduced the testimony of 30 witnesses in rebuttal.

A very voluminous record is before us, consisting of 814 pages.

It is the Government's contention that the facts disclosed in the evidence in the case at bar compel a conclusion different from that reached in the *Rotberg* case, and that the testimony in that case has been shown to be misleading and inaccurate. It therefore asks for a reversal of the judgment appealed from upon the ground that the judgment of the trial court is clearly contrary to the weight of the evidence.

The Government also assigns errors in the conduct of the trial, which will be hereinafter discussed.

In our decision in the *Rotberg* case we summarized the testimony in the record there before us, relating to the treatment of dogskins exported from China, as follows:

> It must be remembered that the sole concern here is with the merchandise in its condition as imported. Four of the witnesses called on behalf of importer qualified as being familiar with that processing of the skins which takes place in China. According to this testimony, it seems that the skins are sometimes, possibly usually (but this is not of importance), taken from the animals in extreme cold weather and placed in piles where they are allowed to lie until the weather becomes warmer. The first process applied to the skins when treatment of them actually begins is to scrape off fat and remove dirt. They are then placed in the sun for drying. After being dried, they are placed in barrels or vats containing water with which there is mixed a flour, described as "dalyon flour," made from some kind of Chinese cereal. They remain in these barrels or vats for several days—one witness says, "perhaps six or seven days." They are then taken out and put in the sun for drying. After being dried, if any are in a very hardened condition such are returned to the barrel or vat, again soaked, and again dried in the sun. After being dried, the skins are packed in bales, 200 to 300 skins to the bale, by press packing machines, and thus exported.
>
> So far as the record discloses, the foregoing constitutes the whole of the processing which takes place in China, and the primary question is, Does such processing render the skins dressed furs or dressed fur skins within the meaning of paragraph 1519 (a), *supra?*

We there held that the trial court was warranted in holding that the process described in the above quotation did not render the dogskins either dressed or partly dressed, and we therefore affirmed the judgment of that court in holding that the skins were free of duty as "furs * * * undressed" under paragraph 1681 of the Tariff Act of 1930.

In the case at bar it is established that, in addition to the process described in the *Rotberg* record, there was employed in the treatment

·of the skins in China sea salt, to the extent of three-quarters to 1 pound to the gallon of water, and that sea salt contains sodium ·sulphate and sodium chloride.

The real issue, therefore, is whether, in treating the dogskins in ·China, the use of sea salt in the quantity above stated, in addition to the water and flour testified to in the *Rotberg* case, rendered the ·skins dressed or partially dressed.

The principal testimony on behalf of the Government consisted of the testimony of five scientific witnesses, two of whom, Dr. Edwin R. Theis and Frank G. Ashbrook, at the instance of the Government, visited China in August, 1937 for the purpose of observing there the treatment given dogskins prior to exportation.

The testimony of these scientists related in large part to the condition and a chemical analysis of certain exhibits, including the ·samples introduced in evidence in the *Rotberg* case.

Appellee in rebuttal introduced the testimony of three scientists.

The testimony of the scientists .testifying on behalf of appellant and those testifying on behalf of appellee is irreconcilable. Three of appellant's scientists expressed the opinion that the involved skins represented by Exhibit 1 were dressed; two others expressed no opinion upon this point. All of appellee's scientists, three in number, expressed the opinion that the skins were undressed.

In this connection we deem it proper to quote a paragraph from Judge McClelland's dissenting opinion:

At least one witness for the Government and one for the plaintiff immersed portions of Collective Exhibit 1 in water for varying periods up to 12 hours, and, strangely enough, those immersed by the Government's witness, when wrung out and dried, remained soft, while those immersed by plaintiff's witness became boardy and stiff. This contradiction is an apt illustration of the mass of irreconcilable conflicts in the testimony of witnesses found in this record, the feature in each instance being that the respective opinions of the witnesses support the contention of the party who called them.

A careful examination of the record, however, leads us to remark that the statements made in the above quotation should be qualified to some extent; but it is true, generally speaking, that the testimony as a whole upon behalf of appellant is squarely in conflict with the testimony on behalf of appellee.

The chemical analysis of the skins embraced in Exhibit 1 indicated the presence therein of aluminum oxide. An analysis made by appellant's witness of samples of the involved dogskins showed a range of from 0.94 to 1.44 per cent of aluminum oxide, while an analysis of such dogskins made by appellee's witness Blair showed a range of from 0.17 to 0.34 per cent. This well illustrates the conflict between the testimony in behalf of the respective parties.

While there is some indication in the testimony of some of appellant's experts that aluminum oxide must have been used as a chemical

agent in treating the skins in China, all of the chemists testifying upon this point agreed that both dogskins and sea salt contain some aluminum in some of its forms.

This question, however, does not require consideration from us for the reason that Dr. Theis, one of appellant's witnesses, in cross-examination testified as follows:

R. X Q. Dr. Theis, you stated in your direct examination that you had gone to China to make an investigation on behalf of the Treasury Department of the United States, as to the processing of China dogskins. Will you please state whether the following is a correct statement of what you found that China process to be? That the China process consists of an immersing a fleshed dogskin in salt water and millet or cereal flour, the water containing three-quarters to one pound of sea salt to the gallon; that nothing else is added to the mixture.—A. That is essentially correct.

In view of this testimony the only question before us, upon the merits of the case, is whether the treatment of the skins in China by the use of flour, sea salt, and water, rendered the skins dressed or partially dressed, or whether such treatment was merely for the purpose of preserving the skins in their natural state.

Much testimony appears in the record as to what was done to skins of the character here involved after importation into this country. Upon this point the trial court in its decision stated:

It must be constantly kept in mind that what was done to these skins in the United States was irrespective of the work that was done in China. Whether or not these skins were fully preserved or partially so in China, all the material used in such preservation in China was washed out or removed in the United States, and the skins restored to their natural condition. The process through which these skins passed in the United States to fit them for ultimate use were all the processes that were necessary to render them dressed skins. Every necessary process of dressing took place in the United States, and what was done to these skins in China was without any assistance or benefit to their dressing in the United States. Therefore, the facts fully warrant the holding that this merchandise did not receive a single element of manufacture in China that was of any use to their dressing or manufacture in the United States; that what was done in the United States was for the purpose of fully dressing the skins and rendering them usable material for manufacture into fur articles or garments. The authorities fully sanction this holding, and a re-reading of the testimony is convincing that what was done in China had not any reference to dressing, and was wholly useless in the manufacture of these skins. Therefore, the elements of dressing and manufacture have been driven out of this case by the overwhelming weight of the testimony.

With respect to the use of salt in the treatment of the skins in China, the trial court also said:

* * * The fact that some of the evidence indicates that salt may have been added besides the flour or powder before exportation merely emphasizes that preservation was the purpose in mind prior to exportation from China, and not manufacture. A temporary preservation which does not serve any purpose in the manufacture or dressing of these dogskins after importation, but rather is a

detriment thereto, because the preservative or preservatives have to be removed, cannot render these dogskins in their imported condition "articles manufactured * * * in part" within the meaning of those words in paragraph 1558, even if they were "not enumerated or provided for" in the tariff act, and we are convinced they are provided for as fur skins, undressed, under paragraph. 1681.

We think that the evidence clearly establishes that the dogskins as imported were not completely dressed. The trial court was unanimous in so holding, as Judge McClelland's dissent was based wholly upon his view that the skins were partially dressed before exportation. from China.

Whether the treatment given the dogskins in China constituted a partial dressing presents a question of greater difficulty. We have examined the voluminous record with care. As hereinbefore stated, the evidence is conflicting as to the results of the treatment given the skins in China.

It is the theory of appellant that the use of the mixture of flour, sea salt, and water upon the dogskins resulted in a process of fermentation which rendered the skins partly dressed. Dr. Theis, one of appellant's witnesses, so testified; but another of appellant's witnesses, Mr. Bachrach, a fur consultant and author of books upon furs, testified upon this point in cross-examination as follows:

R. X Q. Well will salt and flour ferment?—A. As two dry ingredients?
R. X Q. Yes.—A. No, sir.
R. X Q. When they are wet, will they?—A. Not unless furthered by some other agency to cause fermentation.
R. X Q. Yeast would do it, wouldn't it?—A. Yes, sir.

*       *       *       *       *       *       *

R. X Q. What would the fermentation do to a dogskin, if you know?—A. It would swell the fibers of the skin.
R. X Q. And permit what?—A. Entrance of any other salts in combination.
R. X Q. Entrance of any other what?—A. With that fermentation process, or any other materials beside salts, that would aid in keeping the fibers of the skin apart.
R. X Q. Starch?—A. Starch is a break-down of flour.
R. X Q. Would flour in combination with sea salt, including sodium chloride and sodium sulphate and water break down sufficiently, break down to become starch?—A. There must be another combination of a chemical. * * *

It will thus be seen that appellant's own witnesses disagreed upon this point.

No useful purpose would be served in analyzing in this opinion in detail the voluminous testimony found in the record upon the question here involved. It is sufficient to say that it was the province of the trial court to weigh the conflicting evidence. This it seems to have done with great care, and both the majority and dissenting opinions review the evidence at great length.

It is so well established as to require no citation of authority that judgments of the Customs Court in protest cases based upon facts found by it will not be reversed unless found by us to be clearly contrary to the weight of the evidence.

Moreover, regard must be had of the fact that the judges of the trial court had opportunities for observing the witnesses which this court does not have. Having heard the witnesses testify, the trial court could form a better judgment of the character of the testimony and the credibility of the witnesses than can this court. *Callbeck v. United States*, 21 C. C. P. A. (Customs) 1, T. D. 46318.

Upon careful consideration of the testimony, we cannot hold that the finding of the trial court that the involved dogskins are undressed is clearly contrary to the weight of the evidence.

Appellant argued that in the *Rotberg* case the witnesses in behalf of appellee testified that the only materials used in the process of treatment of the dogskins in China were flour and water, and that such process was solely for the preservation of the skins, and that it is now established that such testimony was inaccurate and misleading.

It now appears that such testimony was inaccurate in that sea salt was used, as hereinbefore noted, and that the use of flour and water alone would not serve as a preservative of the dogskins. However, we do not regard these facts as warranting a reversal of the judgment appealed from. It appears from the evidence in the case at bar that the use of water and flour alone in the treatment of dogskins would not serve either to preserve the dogskins or to dress or partly dress them.

In appellant's assignments of error, in addition to those going to the merits of the case, there are four assignments with relation to motions ruled upon during the progress of the trial, and error is assigned in denying appellant's motion for a rehearing. In addition appellant assigns 46 errors in regard to the admission and exclusion of evidence.

We will first consider the assignments of errors with respect to motions ruled on during the progress of the trial.

As hereinbefore stated, the trial was begun on June 8, 1937, when appellee moved the incorporation in the instant case of the record in the *Rotberg* case, which motion was granted, whereupon appellee rested its case.

The next day, June 9, appellant's counsel moved for a continuance of the cases in order that chemists in the Bureau of Standards could make tests of the involved skins and testify as to the result of such tests. This motion was granted and the cases were continued to June 14. On that day appellant moved for a further continuance of the case until the October term. This motion was granted over

the objection of appellee's counsel, Judge Brown dissenting. On October 5, 1937, the case was continued by consent to October 19. On October 19 appellant moved for a further continuance of the case for 6 months. The ground of this motion was that appellant's scientific witnesses, in making their investigations and tests, found it necessary to have for their study raw Chinese dogskins; that it would require 8 weeks to procure such dogskins from China; and that it would require 3 or 4 months thereafter for appellant's scientific witnesses to complete their investigation. After argument, and over the objection of appellee's counsel, the cases were continued to January 17, 1938, and they were peremptorily set for that date. On January 17 the cases were continued to January 24.

On January 24 appellant moved for a further continuance of the case, basing the same upon certain affidavits, among which was an affidavit by Hon. Charles D. Lawrence, then acting Assistant Attorney General of the United States. In this affidavit Mr. Lawrence stated that he was appointed to the position above stated on December 16, 1937, and had personal charge of these cases; that although he had diligently worked to prepare the cases for trial he did not believe that he could intelligently prepare the cases until April, 1938.

Other affidavits were presented by chemists stating that 2 months' additional time would be required by them to complete their examination and tests of Chinese dogskins.

This motion was denied, Presiding Judge McClelland stating:

> The court, after what it deems to be due deliberation, has decided to deny the motion for a continuance. This is in view of the fact that this issue has been pending in the Court for several years, and it would seem as though if the Government had any intention of presenting the kind of evidence that has been outlined here that it hopes to present on this trial, it might have been discovered and prepared long, long ago. The motion is denied.

Appellant contends that the denial of this motion was an abuse of discretion by the trial court. We cannot so find; considering the length of time that this issue had been pending before the Customs Court, we think the trial court was warranted in denying a further continuance.

Appellant also assigns error in denying its motion for a rehearing of the case. This motion is predicated in large part upon the affidavit of one Nicholson, an attaché of the Treasury Department located at Shanghai, China. In said affidavit he states that in November 1937, under directions given him on November 6, he witnessed the treatment given in China to Chinese dogskins for shipment to the United States, and sets out such treatment at length; that he shipped to the United States dogskins the treatment of which he had observed; that he also shipped various materials used in such treatment; that in January, 1938, he received authorization to pre-

pare himself to proceed to the United States to testify in this case, but that later in January such authorization was revoked because the trial court had denied the Government's motion for a continuance.

No reason is given why Mr. Nicholson might not have set out for the United States in December and arrived in New York in time for the trial. The case had been peremptorily set for January 17, 1938, and the Government relied upon a further continuance at its peril.

With respect to another affidavit of one Vas, a chemist and a resident of Tientsin, China, we would observe that no reason is disclosed in the motion papers why this witness or other witnesses familiar with the treatment of dogskins in China could not have been produced at the trial, or their depositions taken prior thereto. The mere statement in the affidavit of Mr. Lawrence that the evidence which these witnesses might give was not available at the time of the trial, and a general statement that war conditions in China delayed the investigation, do not present a sufficient basis for a finding of error in the denial of appellant's motion for a rehearing.

With respect to appellant's assignments of error in the exclusion and admission of evidence upon the trial, 46 in number, appellant in its brief has stressed only those which we will now discuss. Assignment 38 alleges that error was committed in excluding from evidence Government Exhibit 19, which the witness Ruderman testified was a raw dogskin which he had dyed in the usual commercial way. The objection to its reception was sustained upon the ground that the exhibit had no possible bearing on whether the involved skins as imported were dressed. The balance of this assignment charges that appellant was denied "the right to prove that a raw dog skin if subjected to the usual wood dye black dyeing process employed on these skins would not dress the said skin." Nowhere does appellee contend that a mere dyeing process dresses a raw dogskin. The dyeing of dogskins is not in issue in this case, and proof that a mere dyeing process does not dress a raw dogskin could have no bearing upon the question of whether the involved skins as imported were undressed.

The next assignment of error discussed by appellant in its brief relates to the exclusion of certain documents in connection with some drawback entries covering imported Chinese dogskins which had been dyed in the United States and exported. The relevant fact stated in these documents was that the dogskins had been dyed in the United States, and we think the fact that the affidavits stated that the skins when received by the dyers were designated as dressed is immaterial to the issue here. It appears that all Chinese dogskins had been classified as "furs * * * dressed" and there was no issue upon this point in relation to the drawback.

Error is alleged in excluding the testimony of one Joseph J. Gallichio, an employee of the Department of Health of the City of New York. Appellant endeavored to show that dressers of fur skins in New York must have licenses to dress skins, and offered to prove that two concerns, Rosenblum & Jasper and W. & P. Frank, Inc., had never applied for or received licenses to dress fur skins in the city of New York, although it had been testified by witnesses for appellee that said firms were dressers and dyers of fur skins. We fail to see how such testimony would have any bearing upon whether the involved dogskins as imported were undressed, and we think it would have no material bearing upon the testimony as to the processes employed by such firms in their treatment of dogskins.

We would observe further that in the *Rotberg* case one Philip Frank testified that he was associated with W. & P. Frank, Inc.; that said company was a dyer and that it does not hold itself out as a dresser of dogskins but as a dyer.

With respect to Rosenblum & Jasper, referred to above, in the *Rotberg* case one Zechowy testified that he was connected with that firm, and that its business is dyeing of dogskins and that it does not hold itself out as a dresser of dogskins.

Appellant also assigns error in excluding certain testimony of one Lapidus, a fur buyer who was a witness for appellant. Appellant in its brief states:

The lower court excluded practically all of the testimony of Abraham Lapidus (R. 720, etc.) (Assignments of Error 44–48, R. 9) and Government Exhibit 25 for Identification (R. 726). The apparent reason for the action of the lower court was that this testimony was offered too late (R. 719–720). * * *

It is clear to us that the evidence referred to in the above quotation was excluded on the ground that it was not proper surrebuttal.

On January 31, 1939, appellant rested its case; on the next day, February 1, appellee began the introduction of rebuttal testimony which continued, with intervals between, until February 25, when appellee rested its case in rebuttal. On February 28 appellant offered the testimony of the witness after being informed by the court that no testimony would be received which should have been offered before appellant rested its case.

The testimony offered and excluded was not proper surrebuttal, and there was no abuse of discretion by the trial court in refusing to admit the same.

With respect to the assignments of error not discussed in appellant's brief, we have carefully examined them and find no prejudicial error in the rulings complained of.

We find no reversible error in the decision of the trial court and the judgment appealed from is *affirmed*.